CAUSE NO. _____

| | | |
|---|---|---|
| **BLACK ROCK MANUFACTURING,** | § | **IN THE DISTRICT COURT OF** |
| **BLACK ROCK RED CLIFF, BLAKE** | § | |
| **RATLIFF** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| *Plaintiffs,* | § | |
| **vs.** | § | |
| | § | _____ **JUDICIAL DISTRICT** |
| **ONWARD     CONSULTING     CORP.,** | § | |
| **ASHLEY JONES, MICHAEL JONES,** | § | |
| | | |
| *Defendants.* | | |

## DECLARATION & VERIFICATION

| | |
|---|---|
| STATE OF TEXAS, | § |
| | § |
| COUNTY OF HARRIS | § |

1.      My name is Blake Ratliff. I am the President of Black Rock Manufacturing ("BRM") and the President of Black Rock Red Cliff ("BRRC"). I am over 21 years old and I have never been convicted of a felony or a crime of moral turpitude. I am fully competent in all respects to make the statements contained herein all of which are based upon personal knowledge unless otherwise indicated.

2.      This Declaration is made in support of Plaintiffs' Verified Petition for a Temporary Restraining Order and Temporary Injunction Pending Arbitration ("Verified Petition"). I have reviewed Plaintiffs' Verified Petition, and the factual statements contained therein are either within my personal knowledge or based upon my review and analysis of the documents provided in this matter, and are true, correct, and accurate. Those facts are incorporated herein by reference if necessary.

3.      On or about September 15, 2020, Defendant Michael Jones and Defendant Ashley Jones founded Onward Consulting Corp. Onward Consulting has a website with the following web address: https://onwardresearch.com/. Onward Consulting sold and continues to sell various

1

manufactured products, including accessories (key chains, patches, stickers), apparel (hats, outerwear, t-shirts), and gear (chest rigs, pouches, slings).

4.      I founded BRRC on or about May 19, 2022. I then founded BRM on or about July 18, 2022. I am in the manufacturing industry and manufacture all types of products – and, in particular, metal machined firearm accessories and other military oriented paraphernalia.

5.      I became familiar with Onward Consulting in or about late 2021 or early 2022. The Joneses solicited me to invest in Onward Consulting. Because of Onward Consulting's YouTube following, I saw an opportunity to invest in a growing company. Accordingly, on August 2, 2022, I purchased 500 shares of Onward Consulting's stock, with a par value of $200 per share, for a total investment of $100,000. I entered into a Stock Sale and Purchase Agreement with Onward Consulting on August 2, 2022. A true and correct copy of the Stock Sale and Purchase Agreement is attached as Exhibit 1.

6.      An Onward Consulting board meeting was held on or about October 17, 2022, and I was unanimously nominated as the Chairman of the Board. Also on October 17, 2022, Onward Consulting and BRRC entered into an Exclusive Manufacturing Agreement. A true and correct copy of the Exclusive Manufacturing Agreement is attached as Exhibit 2. Based upon the terms of the Exclusive Manufacturing Agreement, I invested over $700,000 to build manufacturing facilities in Harris County, Texas, with the purpose of producing the goods that would be sold on the Defendants' various selling platforms.

7.      On October 24, 2022, Onward Consulting entered into a Sales Exclusivity Agreement with BRM which provided that Onward Consulting would purchase 500 MP5 Grenade Launcher Rail Systems from BRM for a total purchase price of $86,250. A true and correct copy of the Sales Exclusivity Agreement is attached as Exhibit 3. BRM manufactured the

Certified Document Number: 107451985 - Page 2 of 4

69611892;1

first set of MP5 rails and sent them to Onward Consulting for approval. Defendants, for their part, refuse to respond or approve/change those prototypes.

8.      I learned that Defendants had been purchasing and importing goods in direct violation of the Exclusive Manufacturing Agreement and were in fact planning on making a large "product drop" of those offending goods on April 7, 2023. A copy of this "product drop" advertisement is attached as Exhibit 4. I confronted Defendants with this information, and Defendants, through counsel, threatened to "just take" my ownership interest in the companies and also threatened that the companies would be left "empty" if I attempted to assert my ownership interests and contractual rights.

9.      Defendants breached their duties as officers and directors of Onward Consulting by mismanaging the company, attempting to "kick me out" of the company and take my stock, using and keeping the corporate funds within the company for themselves, by misapplying and using my investment for themselves, and by using the company as a conduit to breach the above agreements by planning to sell foreign counterfeit goods in place of the American made goods that were supposed to be sold by the company. I provided notice and a demand to cure this conduct previously, and Defendants refused and ignored that request.

10.     I am also seeking an accounting and inspection of the books and records for Onward Consulting, and hereby renew my request under oath as a shareholder in the company and request that the company provide full disclosure of its books and records, including a full accounting of all profits, losses, and distributions, as well as all books and records the corporation has actual possession and control over. That inspection shall occur during normal hours of business and are for the legitimate purposes of investigating the company as explained in the Petition.

Certified Document Number: 107451985 - Page 3 of 4

69611892;1

11.    The documents attached hereto are kept in the ordinary course of our business operations, it is our practice to keep these types of documents and records, and they are kept by me as the general custodian of records for the company. My name is Blake Ratliff, my date of birth is August 3, 1989, and my business address is 27359 W Hardy Rd., Ste 208, Spring, Texas 77373. I declare under penalty of perjury that the foregoing is true and correct. Executed in Harris County, State of Texas, on the 4ᵗʰ day of April 2023.

_____
Mr. Blake Ratliff

4

69611892;1



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 4, 2023

Certified Document Number:        107451985 Total Pages:  4

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT 1

Certified Document Number: 107451986 - Page 1 of 7

# Stock Sale and Purchase Agreement

*State of Washington*

This Stock Sale and Purchase Agreement ("Agreement") is made by and between the following parties: Onward Consulting Corp, a corporation, incorporated under the laws of the state of Washington, hereinafter known as "Seller," having an address at the following:

    14407 18TH AVENUE CT S
    Spanaway, WA 98387
    Email: ashley@onwardresearch.com

and Blake Ratliff, an individual, hereinafter known as "Buyer," having an address at the following:

    3312 SW 38th Street, Ocala, Florida, 34474
    Email: blake.ratliff1@gmail.com

The parties shall be individually referred to as "Party" and collectively as the "Parties."

## *RECITALS:*

*WHEREAS, Seller is a corporation, named Onward Consulting Corp (the "Corporation"), that desires to sell its own stock;*

*WHEREAS, Seller desires to sell 500 shares of stock, with a par value of $200 (two hundred US dollars) (the "Stock");*

*WHEREAS, Seller warrants that 10,000 shares of the Stock are in the Seller's possession, and no shares are held external to the Seller's Directors;*

*WHEREAS, Buyer would like to purchase the Stock;*

*WHEREAS, Buyer and Seller have agreed to complete the sale of the Stock through this Agreement and abide by the terms and conditions herein.*

Certified Document Number: 107451986 - Page 2 of 7

## Article 1 - SALE:

Buyer agrees to purchase the Stock for the total sale price of $100,000 (one hundred thousand US dollars) ("Total Sale Price").

The Stock purchased (500 shares) represents 5% of total shares of the Corporation. Buyer will maintain a 5% holding in the Corporation, excluding sale or transference, in part or whole, of the Stock.

## Article 2 - PAYMENT:

The Total Sale Price will be paid in one lump sum payment.

The methods of payment Seller will accept are as follows:

> Wire Transfer

## Article 3 - CLOSING:

The Total Sale Price will be paid in full by the following date: August 5th, 2022 (the "Closing Date"). On the Closing Date, the parties will meet as follows:

Address of Closing:

> 14407 18TH AVENUE CT S
> SPANAWAY, WA 98387

Time of Closing:

> 10AM

On the Closing Date, the Parties will ensure all required documentation between them is complete, including the Seller delivering to the Buyer any relevant stock certificates (the "Stock Certificates"). For any transfer documents required, Seller shall properly cause each document to be executed as needed to ensure Buyer acquires full rights in the Stock.

## Article 4 - SELLER REPRESENTATIONS & WARRANTIES:

Seller hereby represents and warrants that Seller is a duly organized corporation, and in good standing, under the laws of State of Washington and Seller has the authority to sell good title to the Stock.

Seller warrants that Seller has no limitations on making such sale, such as any security interest, lien, or encumbrance. Seller is not a party to any contract with regard to any third party rights in the Stock or voting in the Corporation as a result of the Stock.

Additionally, Seller represents and warrants that there are no restrictions of any kind, including options, stock purchase agreements, or redemption agreements on the Stock.

Seller further represents and warrants that it will take any steps to perfect Buyer's receipt of the Stock as required.

Seller further represents and warrants that the Corporation maintains full and exclusive ownership of "Garand Thumb", "Onward Research" and any derivatives, copyrights, trademarks, and all other definitions.

Seller agrees to indemnify and defend Buyer and its Affiliates and their officers, directors, and employees from and against all costs, losses, expenses, damages, and liabilities that may be incurred or suffered by Buyer and its Affiliates as a result of or arising out of a claim relating to:

> i. Any omission or negligent act of The Corporation, its Affiliates, and its personnel

> ii. Seller's breach of any warranty, representation, or covenant covered in this Agreement

## Article 5 - BUYER REPRESENTATIONS & WARRANTIES:

Buyer hereby represents and warrants that the execution of this sale will not put Buyer in default of any contractual relationship to which Buyer is a party and that Buyer will deliver the Total Sale Price as required under this Agreement.

Buyer warrants that Buyer has consulted with legal and investment advisors regarding the sale or waives the right to do so. Buyer fully understands the benefits and risks of purchasing the Stock.

**Article 6 - RIGHT OF FIRST REFUSAL:**

Right of First Refusal. Provided that the Stock is sold in accordance with the terms of this Agreement, the Representative shall have an irrevocable right of first refusal (the "Right of First Refusal"), for a period of twelve (12) months after the date the Agreement is completed. The Seller shall notify the Buyer of its intention to pursue a Subject Transaction, including the material terms thereof, by providing written notice thereof by registered mail or overnight courier service addressed to the Buyer. If the Seller fails to exercise its Right of First Refusal with respect to any Subject Transaction within ten (10) Business Days after the mailing of such written notice, then the Seller shall have no further claim or right with respect to the Subject Transaction.

The Seller may elect, in its sole and absolute discretion, not to exercise its Right of First Refusal with respect to any Subject Transaction.

**Article 7 - EXPENSES:**

Each Party is responsible for paying its own costs and expenses in connection with this Agreement.

**Article 8 - NO BROKERAGE:**

Seller and Buyer each warrant and agree that no fees are due to any third party as a result of this Agreement, including brokerage fees, finder's fees, commission, or any other payment related to the Parties' transaction.

**Article 9 - NO GUARANTEES:**

Seller does not guarantee any specific performance of the Corporation, including through sales, distributions, or otherwise. Buyer accepts that the sale of this Stock is "as is."

**Article 10 - GENERAL PROVISIONS:**

a) LANGUAGE: All communications made pursuant to this Agreement shall be in the English language.

b) ENTIRE AGREEMENT: This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein and supersedes any prior agreement, written or oral.

c) JURISDICTION, VENUE & CHOICE OF LAW: The laws of the jurisdiction where the Corporation filed its formation documents, specifically the state of Washington shall be applicable to this Agreement, with the exception of its conflict of law provisions.

d) ASSIGNMENT: This Agreement, or the rights granted hereunder, may not be assigned, sold, leased or otherwise transferred in whole or part by either Party, without the written consent of the other.

e) SEVERABILITY: If any part or sub-part of this Agreement is held invalid or unenforceable by a court of law or competent arbitrator, the remaining parts and sub-parts will be enforced to the maximum extent possible. In such condition, the remainder of this Agreement shall continue in full force.

f) HEADINGS FOR CONVENIENCE ONLY: Headings of parts and sub-parts under this Agreement are for convenience and organization, only. Headings shall not affect the meaning of any provisions of this Agreement.

g) NO AGENCY, PARTNERSHIP OR JOINT VENTURE: No agency, partnership, or joint venture has been created between the Parties as a result of this Agreement. No Party has any authority to bind the other to third parties.

*EXECUTION:*

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on the following date: August 2nd, 2022.

Seller: Onward Consulting Corp

Director's Signatures:

Michael Jones:_____

Title:    President_____

Signature: _____

Ashley Jones:_____

Title:    Vice President_____

Signature: _____

Buyer: Blake Ratliff

Signature: _____

8/2/2022



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 4, 2023

Certified Document Number:        107451986 Total Pages:  7

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated**
**documents are valid. If there is a question regarding the validity of this document and or seal**
**please e-mail support@hcdistrictclerk.com**

# EXHIBIT 2

Certified Document Number: 107451987 - Page 1 of 10

## EXCLUSIVE MANUFACTURING AGREEMENT

This Manufacturing Agreement ("Agreement") is entered into as of October 17st, 2022, between ONWARD CONSULTING., a WASHINGTON Corporation, with its principal place of business at 14407 18TH AVENUE CT S. SPANAWAY, WA, 98387 ("Partner") and BLACK ROCK RED CLIFF a TEXAS Corporation with its principal place of business at 27359 W HARDY RD STE 208, SPRING, TEXAS, 77373, ("Manufacturer").

GENERAL

The Partner is in the business of developing, marketing and supporting certain products (defined below). The Manufacturer wishes to manufacture to the dealers and the remarketers of these products and assures the Partner that it has the facilities, personnel, and technical expertise necessary to manufacture the products.

The Manufacturer wishes to obtain from the Partner, and the Partner is willing to grant to the Manufacturer, the exclusive right to manufacture these products for resale purposes.

In consideration for the mutual promises, covenants, and Agreements made below, the parties, intending to be legally bound, agree as follows:

1.    Definitions

For purposes of this Agreement, the following terms will have the indicated definitions:

"Agreement." This Agreement is by and between the Partner and the Manufacturer.

"Information." The documentation, technical information and/or business information, either oral or written that the Partner or the Manufacturer furnishes to the other marked as, proprietary or confidential or simply treated as such by the disclosing party. The products and services, as well as any information relating to services, developments, services, processes, plans, financial information, customer and Partner lists, forecasts and projections. Information shall also include the terms of this Agreement. A party's information shall be deemed confidential under this Agreement unless the information: (1) is in the public domain through no act of other party; (2) is lawfully known by the other party from a source other than the first party with no restriction of confidentiality; or (3) must be disclosed by requirement of law or generally accepted accounting principles.

"Term." The length of the agreement

"Products." Any and all manufactured products offered, sold, distributed, or otherwise shared

"End-User." Any person or entity who obtains the product(s)

"Intellectual Property Rights." The intangible legal rights or interests evidenced by or embodied in (1) any idea, design, concept, technique, invention, discovery, or improvement regardless of patentability, but including patents, patent application, trade secrets and know-how; (2) any work of authorship, regardless of copyrightability, but including copyrights and any moral rights recognized by law; and (3) any other similar rights, in each case on a worldwide basis.

2.    Term

2.1 Term. This Agreement shall commence on the date stated in the first section and remains in force, indefinitely.

2.2 Continuation or Survival of Certain Sections. Certain section, (6.1 & 6.3) as indicated below, will survive and remain effective even after the termination of this Agreement. All other rights and obligations of each party to the other shall terminate upon the termination of this Agreement.

3.    Relationship

3.1 Exclusive Manufacturer. The Partner grants the Manufacturer, and the Manufacturer accepts from the Partner, the exclusive right to manufacture the products. This appointment is subject to the limitations set forth in Section 4.

3.2 Powers as Manufacturer. Except as expressly provided in this Agreement, all aspects of the production of the finished product by the Manufacturer shall be under the Manufacturer's sole control. Product will be produced accordingly to the formulations and specifications provided by the Partner to the Manufacturer. The Manufacturer will exercise full compliance in adhering to those standards of quality established and communicated by the Partner. The Manufacturer is not responsible for the performance of the finished product. The manufacturer is responsible for correctly adhering to the formulation and assembly of product pursuant to Partner's written specifications.

3.3 Powers as Manufacturer. The Partner and the Manufacturer, agree that their relationship is that of the Partner and the manufacturer and not that of joint venturers, principals or agents, or franchisor and franchisee. Both are independent Partners acting for their own accounts, and neither is authorized to make any commitment or representation, express or implied, on the other's behalf unless authorized to do so by the other in writing.

3.4 Use of Trademarks and Trade Names. No right, title or interest in or to any trademarks, trade names, slogans, labels and designs used by either the Partner or the Manufacturer, nor the goodwill connected, is conveyed by this Agreement. The Manufacturer may, in connection with the promotion and sale of the products pursuant to the terms of this Agreement, refer to the Partner's applicable trade names or trademarks provided that all such references are in conformance with the Partner's requirements regarding such use, as such requirements are communicated to the Manufacturer in writing from time to time by the Partner.

3.5 Marketing Responsibility. The Partner shall pursue vigorously sales policies and procedures to realize the maximum sales potential for the products.

Certified Document Number: 107451987 - Page 3 of 10

4.    Manufacturing Rights

In recognition of the investment to be made by the Manufacturer in connection with the manufacturing of the products, the parties agree to each of the following provisions:

4.1.1  The Partner hereby grants the Manufacturer the exclusive right to manufacture the products in the United States. The Partner is prohibited from importing the products into the United States, or soliciting or engaging with other manufacturers.

4.1.2 The Manufacturer reserves the rights to both manufacture and re-sell all products, with Partner's oversight on resell terms to outside buyers.

4.1.3 The exclusive Manufacturing rights granted to the Manufacturer pursuant to this Agreement is perpetual and indefinite.

4.1.4 Other Products. The Partner shall not sell any other products unless manufactured by the Manufacturer.

5.    Manufacturer's Responsibilities

During the term of this Agreement, the Manufacturer agrees to the following:

5.1 Manufacturing Orders. The Manufacturer shall manufacture the products based on purchase orders presented from the Partner and accepted by the Manufacturer.

5.2 Reports. The Manufacturer shall deliver upon the request of the Partner, a monthly report showing the Manufacturer's current inventory of each product (listed in units); (2) the quantity of each product shipped (3) the number of returns and (4) other relevant information for the prior month as request from time to time by the Partner.

5.3 Compliance with Laws. The Manufacturer shall comply with all material applicable present and future federal, state, county, local and, where necessary, foreign laws, ordinance and regulation relating to the sale of the products.

6.    Partner's Rights and Responsibilities

6.1 Service Manual(s). Upon execution of this Agreement, the Partner shall provide the Manufacturer with any and all designs related to the products.

6.2 Training. The Manufacturer will not provide training to the Partner or its customers.

6.3 System Documentation. The Partner shall provide at no charge to the

Certified Document Number: 107451987 - Page 4 of 10

uses for the products during the Term of this Agreement and for five years thereafter. The Manufacturer may use and/or reproduce and/or translate such materials, in whole or in part, but shall reproduce and include any copyright and proprietary notice of the Manufacturer on all copies of such materials.

6.4 Partner Determination of Product Content. The Partner reserves the right to determine the contents of the product, including its specification, features, and functions, as well as any documentation or related materials; (2) change or terminate any of the specifications, features, or functions of the products. Any changes made to the product shall be indicated in writing to the Manufacturer. The Manufacturer may cancel any orders for discontinued products without liability. The cancellation is limited to only those orders placed by the manufacturer on behalf of the Partner that the Partner then discontinues the use of said raw material. The Partner will be responsible for payment to the Manufacturer for any discontinued raw materials or for any product or service purchased by the Manufacturer on behalf of the Partner. The Partner will identify any hazardous components associated with the manufacture or distribution of its product by the Manufacturer.

7.    Purchase Orders

7.1 Initial Order. The Partner will issue all instructions to Manufacturer in the form of a confirmed purchase order. The Initial Order shall be non-cancelable. The Manufacturer does not require deposit for this order.

7.2 Subsequent Orders. All subsequent orders shall be in writing or if placed orally, shall be confirmed in writing within three business days after such oral order. All orders, whether in writing or verbal shall specify: (1) the quantity and description of the products; (2) requested delivery dates (3) applicable price; and (4) any special instructions. All orders shall be governed solely by the terms and conditions of this Agreement. No additional or different provisions contained in the Partner's purchase orders or any other business forms shall be of any force or effect whatsoever unless agreed to in writing by the other party.

7.3 Manufacturer's Acceptance. All orders for products by the Partners shall be subject to acceptance by the Manufacturer and shall not be binding on the Manufacturer until acceptance of the written purchase order by the Manufacturer is confirmed in writing to the Partner. The Manufacturer must evaluate the terms of the purchase order to determine if the specified delivery date can be accomplished. The Manufacturer will require a minimum production allowance of 12 weeks on the initial order and 8 weeks on all subsequent orders, subject to change. Lead times will be reduced once Partner is able to forecast annual production requirements.

7.4 Controlling Terms. The terms and conditions of this Agreement shall apply to each order accepted or shipped by the Manufacturer under this Agreement. Any terms or conditions appearing on the face or reverse side of any purchase order, acknowledgment, or confirmation that are different from or in addition to those required under this Agreement shall not be binding on the parties, even if signed and returned, unless both parties expressly agree in a separate writing to be bound by such separate or additional terms and conditions.

any taxes, levies, duties or fees of any kind, nature or description whatsoever applicable to the sale of any products by the Partner. The Manufacturer shall not be required to pay taxes for product which it provides the Partner, by the time of the submission of its purchase order to the Manufacturer, tax exemption certificates or licenses acceptable to the appropriate taxing authorities. In connection with the delivery of the products, the Partner may designate the carrier for shipment and the amount of insurance and nature of coverage. If the Partner fails to so designate any or all such items, the Manufacturer, at its discretion, may specify any item not so designated.

7.0 Acceptance Tests. The Partner shall formulate, subject to the Manufacturer's approval, Acceptance Test Procedures. The Partner has the right to conduct acceptance test on any of the products and may reject those that fail to pass that test. Such rejection shall be evidenced by notice of rejection to the Manufacturer, together with an indication of the basis for that rejection. The Manufacturer shall have no obligations with respect to any products properly manufactured by it pursuant to this Agreement.

8.0 Taxes. Prices to the Partner do not include taxes of any nature.

8.1 Payment. After the initial order and based upon an established line of credit, the Partner shall pay the Manufacturer's invoices to the Partner within thirty days of the invoice date. The terms of any payments made to the Manufacturer from the proceeds of letters of credit must be pre-approved by the Manufacturer. The Partner must maintain a current account with the Manufacturer in order to have additional orders for products filled. Any outstanding payments incur a $1,000 (One Thousand US Dollars) per day from the due date until the full amount is paid.

9.    Shipment, Risk of Loss and Delivery

9.1 Risk of Loss. Except as provided below, title to the products purchased pursuant to this Agreement will pass upon delivery to the Partner. The Partner assumes the risk of loss and damage of the products in transit from the Partner's shipping point to the point of destination.

9.2 Modifications. The Manufacturer shall not have the right to modify any of the products, without the expressed written consent of the Partner.

9.3 Shipment. All products shall be shipped by the Manufacturer Shipments shall be made to the Partner's identified warehouse facilities or freight forwarded to the end-user as specified by the Partner. Unless specified in the Partner's order, the Manufacturer shall select the mode of shipment and the carrier. The Partner shall be responsible for and shall pay all shipping, freight, and insurance charges, which charges the Manufacturer may require the Partner to pay in advance.

10.0 Disclaimer, No Other Warranty. The Manufacturer grants no warranties, express or implied, by statute or otherwise. Manufacturer does warranty its strict adherence to the Partners formulation and specification instructions.

10.1 Limitation of Liability. The Manufacturer warrants and guarantees, it s liability being limited to the purchase price of the products, strict compliance with the expressed specifications of the Partner in manufacturing the products. The Manufacturer shall not be liable for the cost of procurement of substitute goods by the customer or for an special, consequential or incidental damages for breach of warranty.

10.2 Product Liability. The Partner bears responsibility for any claims arising out of product liability suits or fines.

10.3 Indemnification. The Manufacturer represents that it holds product liability insurance for its operation and will provide the Partner with proof of the same. The product liability insurance held by the Manufacturer insures against bodily injury or property damage resulting from improperly manufactured products. The Manufacturer will be liable for any claim resulting from the Manufacturer's failure to adhere to the Partner's formulation and specifications. The Partner shall indemnify and hold harmless the Manufacturer for damages or expenses resulting from any claim, suit or proceeding brought against the Manufacturer on the issue of product performance or user liability. The Manufacturer agrees that the Partner has the right to defend, or at its option to settle, and the Partner agrees that the Partner has the right to defend, or at its option to settle, and the Partner agrees, at its own expense, to defend or at its option to settle, any claim, suit or proceeding brought against the Manufacturer or its Customer on the issue of product liability, subject to the limitation set forth in this Agreement. The Partner shall have sole control of any such action or settlement negotiations, and the Partner agrees to pay, subject to the limitations of this Agreement set forth, any final judgment entered against the Manufacturer or its Customer on such issue in any such suit or proceeding defended by the Partner. The Manufacturer agrees that the Partner at its sole option shall be relieved of the foregoing obligations unless the Manufacturer or its Customer notifies the Partner promptly in writing of such claim, suit or proceeding and gives the Partner authority to proceed as contemplated herein, and, at the Partner's expense, gives the Partner proper and full information and assistance to settle and/or defend any such claim, suit or proceeding.

10.4 Entire Liability. The foregoing provisions of this Section 10 state the entire liability and obligations of the Partner and the exclusive remedy of the Manufacturer and its Customers, with respect to any alleged product liability suit related to the products or any part thereof.

11.   Ownership Warrant and Indemnification

11.1 Partner Ownership Warranty. The Partner represents and warrants to the Manufacturer that: (1) the products are the originals with the Partner; (2) the products do not infringe upon any patent, Copyright, trade secret or other proprietary rights of others; (3) the Partner has full power and authority to grant the rights granted within this Agreement to the Manufacturer; and (4) the Partner has not previously or otherwise granted any other rights

11.2 Indemnification. The Partner agrees to defend at its expense and hold the Manufacturer harmless from any claim, demand, or suit against the Manufacturer resulting from a breach of any of the warranties set forth above in Section 11.1 and to pay any cost, damages, or expenses (including attorneys' fees) arising from any such claim, demand, or suit. The Partner shall have sole control of the defense of such action and all negotiations for its compromise or settlement. The Manufacturer shall timely notify the Partner in writing of any such claim, demand, or suit, and, at the Partner's request and expense, provide the Partner with all available information, assistance and authority to enable the Partner to defend the same. The Partner shall indemnify the Manufacturer for all such costs, damages, and expenses as they are incurred.

11.3 Continued Use. Following notice of a claim or demand or a threatened or actual suit, the Partner shall immediately, at its own expense, procure for the Manufacturer the right to continue the use of the products subject to such claim, demand or suit, or, having failed to obtain such rights, replace or modify such products to make them non-infringing, or, having failed to replace or modify the products, refund to the Manufacturer the purchase price of all unsold products. If the Manufacturer elects to replace or modify any of the products, such replacement or modification shall substantially meet the performance and interface specifications of the replaced or modified products.

11.4 Modification of the Products. The Partner shall have no liability for any claim of infringement based on the Manufacturer's combination of the products with products not supplied by the Partner if such claim would have been avoided by the use of the products without such specific products.

11.5 Survival of Warranties. The warranties and indemnities stated in this Section 11 shall survive the expiration or termination of this Agreement.

12.     Limitation of Liability

12.1 Limitation of Liability. The warranties contained in Section 10 and 11 above are in lieu of all other warranties and conditions expressed or implied, including, but not limited to, those governing merchantability or fitness for a particular purpose. In the event that, despite Section 10, Manufacturer is found liable for damages based on any defect of nonconformity in the products, its total liability for each defective product shall not exceed the discounted price of such defective products.

12.2 Exclusion of Consequential Damages. In no event shall either party be liable to the other or any dealer or end-user for any indirect, special or consequential damages including, without limitation, lost profits, costs of delay, any failure of delivery or liability to third party arising from any source even if the party had been advised of the foreseeability of the same.

13. Trademarks. The Partner shall have and retain sole ownership of the Trademarks, including the goodwill pertaining thereto. Subject to the Manufacturer's compliance with the Partner's standard cooperative advertising policies, the Partner hereby grants to the Manufacturer the right to use and display the Trademarks solely in connection with and solely to the extent

14. Notification. The Manufacturer shall promptly notify the Partner of (1) any claims, allegations, or notification that its marketing, licensing, support, or service of the products may or will infringe the Intellectual Property Rights of any other person or entity; and (2) any determination, discovery, or notification that any person or entity is or may be infringing the Intellectual Property Rights of the Partner. The Manufacturer shall not take any legal action relating to the protection or defense of any Intellectual Property Rights pertaining to the products without the prior written approval of the Partner. The Manufacturer shall assist in the production and defense of such Intellectual Property Rights.

14.1   Infringement

14.1.1 If notified promptly in writing of and given sole control of the defense and all related negotiations and settlements, the Partner shall defend the Manufacturer against any claim based on an allegation that a product supplied under this Agreement infringes any United States Intellectual Property Rights. The Partner shall pay any resulting costs, damages, and attorney fees finally awarded by a court with respect to any such claims.

14.1.2 Partner shall not be liable to the Manufacturer for any claim arising from or based upon the combination, operation, or use of any product with equipment, data, or programming not supplied by the Partner, or arising from any alteration or modification of products.

14.1.3 The Partner shall have no obligation to the Manufacturer with respect to any infringement involving or concerning the products except as stated in this Section 14.7.

15.1 Force Majeure. Neither party will be deemed in default of this Agreement to the extent that performance of its obligations, or attempts to cure any breach, are delayed or prevented by reason of circumstance beyond its reasonable control, including without limitation fire, natural disaster, earthquake, accident or other acts of God ("Force Majeure"), provided that the party seeking to delay its performance gives the other written notice of any such Force Majeure within 15 days after the discovery of the Force Majeure, and further provided that such party uses its good faith efforts to cure the Force majeure within 60 days of notification or will notify Partner of its inability to do same.

15.2      Settlement of Disputes

Each party acknowledges and agrees that, if there is any breach of this Agreement, including without limitation, unauthorized use or disclosure of Confidential Information or other information of the other party or failure to perform the terms of this contract, the matter will be resolved in accordance with the laws and remedies of the State of Texas under binding arbitration.

15.3 Proprietary Information. Each party acknowledges that it may be furnished with or may otherwise receive or have access to information or material that relates to past, present or future products, software, research development, inventions, processes, techniques, designs or technical information and data, and marketing plans. (The "Proprietary Information"). Each party agrees to

Agreement is signed or afterward, including the terms of this Agreement

15.4 Cumulative Rights. Any specific right or remedy provided in this Agreement shall not be exclusive but shall be cumulative upon all other rights and remedies set forth in this section and allowed under applicable law.

15.5        Governing Law. This Agreement shall be governed by the laws of this State of Texas.

15.6 Severability. If any provision of this Agreement is found invalid or unenforced according to its terms. Without limiting the previous, it is expressly understood and agreed that each and every provision of this Agreement that provides for a limitation of liability, disclaimer of warranties, or exclusion of damages is intended by the parties to be severable and independent of any other provision and to be enforced as such. Further, it is expressly understood and agreed that if any remedy under this Agreement is determined to have failed of its essential purpose, all other limitations of liability and exclusion of damages set forth in this section shall remain in full force and effect.

15.7 Notices. All notices, demands or consents required or permitted under this Agreement shall be in writing and shall be delivered or mailed certified return receipt requested to the respective parties at the addresses set forth above or at such other address as such party shall specify to the other party in writing. Any notice required or permitted to be given by the provisions of this Agreement shall be conclusively deemed to have been received on the day it is delivered to that party by U.S. Mail with Acknowledgement of Receipt or by any commercial courier providing equivalent acknowledgement of receipt. Captions and section headings used in this Agreement are for convenience only and are not a part of this contract and agree to and accept its terms and conditions. We are executing this Agreement as of the day and year first written above.

Partner                    Manufacturer                Partner
By: Michael Jones          By: Blake Ratliff           By: Ashley Jones

Michael Jones              Blake Ratliff               Ashley Jones
Owner    10/17/22          CEO    10/17/22             Owner    10/17/22

Date signed: October 17, 2022



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 4, 2023

Certified Document Number:        107451987 Total Pages:  10

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT 3

Certified Document Number: 107451989 - Page 1 of 9

## Sales Exclusivity Agreement

*State of Texas*

**BACKGROUND:**

A. This Sales Exclusivity Agreement is made effective as of the following date: October 24th, 2022, by and between the following seller (the "Seller"):

BLACK ROCK MANUFACTURING

of

27359 W HARDY RD
STE 208
SPRING, TEXAS
77373

and the following buyer (the "Buyer"):

ONWARD CONSULTING

of

14407 18TH AVENUE CT S
SPANAWAY, WA
98387

B. WHEREAS, Buyer and Seller desire to enter into an exclusive agreement with regard to the purchase of goods, hereinafter referred to as the "Product."

C. WHEREAS, Buyer and Seller are entering into this Agreement in good faith and are relying on its terms.

Now, therefore, for and in consideration of the mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

*I. PRODUCT.*

Certified Document Number: 107451989 - Page 2 of 9

1. Buyer agrees to exclusively buy the following goods (the "Product") in accordance with the terms and conditions of this Agreement:

MP5 Grenade Launcher Rail System

## II. EXCLUSIVITY.

2. Exclusivity shall mean a period beginning on the following date: October 24th, 2022 and ending on the following date: October 24th, 2032.

3. During the exclusivity period, the Buyer will not directly or indirectly, through any employee, agent, or other otherwise, and will not permit any of its agents to solicit, initiate, or encourage any offers or proposals relating to the purchase of the above-mentioned product.

4. Buyer and Seller agree that during the exclusivity period, Buyer shall purchase Product exclusively from Seller and not from any other vendor.

## III. PRODUCT PRICE.

5. For the sale of the Product, Buyer agrees to pay and Seller agrees to accept the following total amount, regardless of the number of shipments: $86,250 (eighty-six thousand two hundred fifty US dollars) (the "Purchase Price"). This Purchase Price is exclusive of any applicable taxes.

6. The Seller and the Buyer each acknowledge the sufficiency of the Purchase Price as consideration.

7. Unless otherwise explicitly agreed to by each of the parties, any sales tax or other similar tax, such as use or excise tax applicable to the sale of the Product will be paid by the Buyer, or the Buyer agrees to provide the Seller with a legitimate and acceptable tax exemption certificate.

## IV. SHIPMENT AND PURCHASING MINIMUMS.

8. As good and valuable consideration for the agreement made herein, the Buyer contracts that they will purchase the following minimum of products from the Seller as described below:

Certified Document Number: 107451989 - Page 3 of 9

500 UNITS, ~~AND AN ADDITIONAL 500 UNITS WITHIN 6 MONTHS. TOTAL 1000 UNITS.~~ 500 UNITS IN TOTAL ORDER MOT

## V. INVOICING AND PAYMENT.

9. The Purchase Price will be paid in only one of the following methods of payment:

WIRE DEPOSIT

10. Unless the Parties have agreed otherwise through a written addendum to this Agreement which has been duly executed, the Purchase Price will be due to the Seller immediately upon receipt of the Product.

11. If any invoice is not paid when due, the Buyer will be charged a late fee of $1,000 (one thousand US dollars) per day, beginning with the day after the payment was due and and ending when Buyer pays the total amount due.

12. Buyer shall pay all costs of collection, including without limitation, reasonable attorney fees.

13. In addition to any other right or remedy provided by law, if Buyer fails to pay for the Product when due, Seller has the option to treat such failure to pay as a material breach of this Agreement, and may cancel this Agreement and/or seek legal remedies.

## VI. DELIVERY.

14. Time is of the essence in the performance of this Agreement.

15. Seller will arrange for delivery by a carrier chosen by Seller.

16. Title to and risk of loss of Product shall pass to Buyer upon delivery F.O.B. at Seller's address to an agent of Buyer including a common carrier, notwithstanding any prepayment or allowance of freight by Seller.

## VII. PRODUCT STANDARDS.

17. The Product shall comply with industry standards.

## VIII. WARRANTY.

18. Seller warrants that the Product shall be free of substantive defects in material and workmanship.

19. SELLER SHALL IN NO EVENT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY NATURE, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*IX. INSPECTION.*

20. Buyer, upon receiving possession of the Product, shall have a reasonable opportunity to inspect the Product to determine if it conforms to the requirements of this Agreement.

21. If Buyer, in good faith, determines that all or a significant portion of the Product is non-conforming, Buyer may return the Product to Seller at Buyer's expense.

22. Buyer must provide written notice to Seller of the reason for rejecting the Product.

23. Seller will have 45 days from the return of the Product to remedy such defects under the terms of this Agreement.

*X. CONFIDENTIALITY.*

24. The term "Confidential Information" shall include any proprietary information, in whatever form, that:

    (a) is provided by either Party to the other, including information regarding the Party's businesses, finances, prospects, operations, products, employees, technologies, contact lists, and financial models (including not only written information but also information transferred verbally, visually, electronically or by any other means); or

    (b) concerns any agreements that Seller may aid Buyer in entering into in the course of their providing services; or

    (c) consists of analysis and/or any other internal non-redacted memoranda, or other documents prepared by either Party derived from, or including material portions of, the Confidential Information.

25. Confidential Information shall not include any information that:

Certified Document Number: 107451989 - Page 5 of 9

4/8

(a) is already known to the Party at the time of its disclosure;

(b) is or becomes publicly known through no wrongful act of a Party; or

(c) is communicated to a third party with the express written consent of the concerned Party.

26. The Seller shall safeguard and keep confidential the Confidential Information and shall not disclose any Confidential Information to any other person or entity.

27. The Seller shall not use the Confidential Information for any purpose other than those related to the services they provide to the Buyer.

28. All such Confidential Information and any copies obtained thereof shall be returned to the Buyer promptly upon its written request and shall not be retained in any form by Seller.

## XI. DEFAULT.

29. The occurrence of any of the following shall constitute a material default under this Agreement:

(a) The failure of Buyer to make a required payment when due.

(b) The insolvency of either party or if either party shall, either voluntarily or involuntarily, become a debtor of or seek protection under Title 11 of the US Bankruptcy Code.

(c) A lawsuit is brought on any claim, seizure, lien, or levy for labor performed or materials used on or furnished to the project by either party, or there is a general assignment for the benefit of creditors, application, or sale for or by any creditor or government agency brought against either party.

(d) The failure of Seller to make available or deliver the product in the time and manner provided for in this Agreement.

## XII. REMEDIES ON DEFAULT.

30. The Parties acknowledge and agree that Seller is entitled to equitable remedies including injunction and specific performance for the breach of any provisions of this Agreement.

31. In addition to any and all other rights available according to law, if either Party defaults by failing to substantially perform any material provision, term, or condition of this Agreement, including without limitation the failure to make a monetary payment when due, the other Party may elect to cancel this Agreement if the default is not cured within 14 days after providing written notice to the defaulting party. This notice shall describe with sufficient detail the nature of the default.

32. The Parties acknowledge and further agree that Buyer is entitled to equitable remedies including injunction and specific performance for the breach of any provisions of this Agreement.

### XIII. FORCE MAJEURE.

33. If performance of this Agreement or any other obligation under this Agreement is prevented, restricted, or interfered with by causes beyond either Party's reasonable control, and if the Party unable to carry out their obligations gives the other Party prompt written notice of the circumstances, then the obligations of the Party invoking this provision shall be suspended to the event necessary by such circumstances.

34. The term "Force Majeure" shall include, but is not limited to, acts of God, fire, explosion, vandalism, flood, storm, illness, injury, earthquake, general unavailability of essential materials, orders of military or civil authority, national emergencies, riots, strikes, lock-outs, work stoppages, or other labor disputes or supplier failures.

35. The Party excused by such events shall use all reasonable efforts under the circumstances to avoid or remove such causes of non-performance and shall proceed to perform with reasonable dispatch whenever such causes are removed or ceased.

36. An act or omission shall be deemed within the reasonable control of a Party if committed, omitted, or caused by such Party, or its employees, officers, agents, subsidiaries, or affiliates.

### XIV. TRANSFER OF RIGHTS.

37. This Agreement shall be binding on any successors of the Parties.

38. Neither Party shall have the right to assign its interests in this Agreement to any other Party, unless the prior written consent of the other Party is obtained.

## XV. NOTICE.

39. Any notice or communication required or permitted under this Agreement shall be sufficiently given if delivered in person or by certified mail, return receipt requested, to the address set forth in the opening paragraph of this Agreement or to such other address as one Party may have furnished to the other in writing.

## XVI. ENTIRE AGREEMENT.

40. This Agreement contains the entire Agreement of the parties regarding the subject matter of this Agreement, and there are no other promises or conditions in any other Agreement, whether oral or written.

## XVII. SEVERABILITY.

41. If any provisions of this Agreement shall be held to be valid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.

42. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

## XVIII. AMENDMENT.

43. This Agreement may be modified or amended if and only if the amendment is made in writing and signed by both Parties.

## XIX. WAIVER OF CONTRACTUAL RIGHTS.

44. The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that Party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

## XX. APPLICABLE LAW.

45. This Agreement shall be governed by the laws of the State of Texas.

IN WITNESS WHEREOF, the Parties execute the Agreement as follows:

**Blake Ratliff**, *Representative of BLACK ROCK MANUFACTURING, Seller*

Date:  10/17/2022

**Michael Jones**, *Representative of ONWARD CONSULTING, Buyer*

Date:  10/17/2022

Ashley K. Jones, Representative of ONWARD CONSULTING, Bu

Date:  10/17/22

Certified Document Number: 107451989 - Page 9 of 9

8/8



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 4, 2023

Certified Document Number:        107451989 Total Pages:  9

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**